Filed 7/10/13  In re T.F. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re T.F. et al., Persons Coming Under the Juvenile Court Law. | |
| | D063197 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518173A-D) |
| v. | |
| MARSHA S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Marsha S., mother of dependent children T.F., Corey F., Kelly F. and Z.F. (collectively, the minors), appeals a juvenile court order summarily denying her petition for modification

under Welfare and Institutions Code section 388,[1] by which she sought to have the minors returned to her custody, or alternatively, to have further reunification services. Marsha also appeals orders terminating her parental rights to the minors, contending no substantial evidence supports the court's findings that the beneficial parent-child relationship exception to adoption did not apply. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2011, the San Diego County Health and Human Services Agency (Agency) filed petitions in the juvenile court under section 300, subdivision (b), alleging eight-year-old T.F., six-year-old Corey, three-year-old Kelly and two-year-old Z.F. were at substantial risk of harm because Marsha had a mental illness that caused her to threaten suicide, and she was unable to provide regular care for the minors. Marsha said she had been coping with depression, was overwhelmed with life and caring for her children and wanted to kill herself to end the pain. She had previously lived in a confidential domestic violence shelter for more than a year after being in an abusive relationship with the minors' father. The court detained the minors in out-of-home care.

Marsha was admitted to a mental health treatment facility. She began taking medication prescribed by her psychiatrist and was stable following her release. A short time later, however, Marsha tried to overdose on sleeping pills, and was readmitted to the mental health treatment facility, where she remained for almost a week.

Marsha was having unsupervised visits with the minors. The social worker recommended Marsha's case plan include individual therapy, parenting classes and

---

[1] All further statutory references are to the Welfare and Institutions Code.

psychotropic medication evaluation and monitoring. At jurisdiction and disposition hearings, the court sustained the allegations of the petitions, declared the minors dependents, removed them from Marsha's custody and placed them in licensed foster care. The court approved Marsha's case plan and ordered her to comply with it.

During the next six months, Marsha did not engage in services. She eventually began seeing a therapist, but was inconsistent in attending sessions with him. She had not seen a psychiatrist for seven months, but was still taking her medications. Marsha did not complete a parenting class. She continued having unsupervised visits with the minors for two hours a week, although she periodically canceled. The minors said they enjoyed visits, at which they ate and played at a park.

Marsha still struggled with her mental health, including having suicidal thoughts. In the social worker's opinion, Marsha had difficulty caring for herself and she was not emotionally healthy enough to participate in services that would prepare her to raise four young children. Consequently, the social worker recommended the court terminate reunification services and set a hearing under section 366.26 to select and implement permanent plans for the minors.

According to addendum reports, Marsha continued to have suicidal thoughts. She tried to check herself into the hospital, but there were no beds available. She quit her job and became homeless. Marsha missed three visits with the minors. She asked the social worker for referrals to mental health services that offered housing, stating she needed structure to address her problems.

In May 2012, Marsha informed the social worker that she missed the last court hearing because she had been hospitalized. She also disclosed she had a drug addiction. Marsha failed to meet with a substance abuse specialist when requested to do so by the social worker.

At the six-month review hearing, the court found Agency had provided Marsha with reasonable services, but Marsha had not made substantive progress with her case plan. The court terminated reunification services and set a section 366.26 selection and implementation hearing.

The social worker assessed the minors as adoptable and recommended adoption as their permanent plans. The minors were bonded to their caregiver, who was committed to adopting all of them. T.F., Corey and Kelly said they wanted their caregiver to adopt them. Three-year-old Z.F. was too young to express an opinion about adoption.

The social worker noted that during the early stages of the dependency proceedings, Marsha consistently visited the minors, but by December 2011, visits became sporadic. Marsha did not contact the caregiver to arrange for visits. In the social worker's opinion, there was no stable parent-child relationship. She believed the minors needed stability, safety and permanency, which their caregiver wanted to provide.

In September 2012, Marsha requested visits with the minors for the first time in seven months. She had entered an inpatient recovery program in July after testing positive for methamphetamine and marijuana. Drug tests in August and September were negative. Marsha resumed visits with the minors on September 22. The first visit occurred at Marsha's drug treatment facility, and Marsha provided backpacks, snacks and drinks for the minors. Later visits took place at a park, and the minors seemed to enjoy their time with Marsha, although

4

they sometimes sought the attention of their caregiver. The social worker and the caregiver reported the minors had no negative reactions when visits ended.

Once visits with Marsha resumed, Corey began having behavior problems. He was angry when he saw Marsha smoking a cigarette because there was a no smoking sign at her drug treatment facility. Corey said Marsha told him and his younger sisters to do bad things so that they could move to another home. He told the caregiver he did not want to return to Marsha's home because "she will hit me with a belt with studs." Z.F. also began to show anxiety about visits with Marsha by wetting the bed.

Marsha completed 12 parenting classes through her residential drug treatment program. Once she completed the rehabilitation phase of the program, she would transition to a six-month aftercare program.

In November 2012, Marsha filed a section 388 petition for modification, seeking to have the minors returned to her care with family maintenance services. Alternatively, Marsha sought further reunification services to the 24-month date. The petition alleged Marsha's circumstances had changed and the proposed modification was in the minors' best interests.

The social worker observed two visits between Marsha and the minors in November. Marsha cancelled a third visit because of rainy weather and admitted she had not followed through on finding an alternative visitation site. Visits generally went well, although Marsha sometimes focused on the older children while Z.F. wandered around confused and looking for her. Marsha brought snacks, engaged the minors in play, took them to the restroom when necessary and walked them to the car when visits ended. The minors experienced no distress

5

at the end of visits. The social worker continued to recommend adoption as the minors' permanent plans.

The minors' court-appointed special advocate (CASA) reported the minors were thriving in the home of their caregiver. They called the caregiver "mom," and felt safe and secure with her. T.F. and Corey wanted the caregiver to adopt them. The CASA noted that during visits, Marsha did not pay attention to Kelly and Z.F., and instead relied on T.F. and Corey to ensure their safety. The CASA recommended a permanent plan of adoption for all four minors.

The court considered Marsha's section 388 petition, reviewed the information provided and heard arguments of counsel. Finding Marsha had not made a prima facie showing of changed circumstances or best interests, the court denied the petition without an evidentiary hearing.

According to a December 2012 addendum report, Marsha recently disclosed she had been seeing a psychiatrist and was taking three psychotropic medications. She telephoned Agency to report the minors were in the hospital, unconscious, following a car accident. When the social worker spoke to Marsha, she said the caregiver told her about the accident and said only T.F. and Z.F., not Corey or Kelly, were unconscious. Marsha said the caregiver would not tell her which hospital the minors were in.

The CASA went to the caregiver's home and learned there had been no car accident, the minors were fine and the caregiver had not spoken to Marsha. When the social worker followed up with Marsha, she insisted she had spoken to the caregiver on a pay telephone in

6

the rehabilitation facility, but there were no witnesses. The next visit was cancelled because the social worker was concerned about Marsha's mental health.

At the contested selection and implementation hearing in December 2012, the court received in evidence Agency's reports and the stipulated testimony of Corey and T.F. If called to testify, Corey would say he enjoyed weekly visits with Marsha and they had fun. He missed her between visits. Corey felt sad when Marsha told him to misbehave so the minors could move to another home. Corey liked living with the caregiver and would be sad if he had to leave. Although Corey was not afraid to live with Marsha, he preferred to be adopted by the caregiver. He was "really, really sure" that he wanted the caregiver to adopt him.

According to T.F.'s stipulated testimony, visits with Marsha were good because she played with the minors, was nice to them, brought them snacks and they had fun. If given a choice, she would stay with the caregiver, who fed her and made her feel safe. T.F. would choose to live in a big house with her siblings and the caregiver. She wanted to be adopted by the caregiver.

Marsha testified she had been visiting the minors every Saturday for two hours, usually in Balboa Park, for the past three months. She brought snacks and water to visits, and once brought the minors backpacks with school supplies. Marsha played with the minors and generally interacted with them. The minors referred to her as "mom" or "mommy Marsha." They ran to her at the beginning of visits, and occasionally had difficulty separating from her when visits ended.

After considering the evidence and arguments of counsel, the court found the minors were likely to be adopted and none of the exceptions to adoption applied. The court terminated parental rights and referred the minors for adoptive placement.

DISCUSSION

I

Marsha contends the court erred by summarily denying her section 388 modification petition. She asserts she made a prima facie showing her circumstances had changed and providing her with further reunification services was in the minors' best interests.[2]

A

A party may petition the court under section 388 to change, modify or set aside a previous court order. The petitioning party has the burden of showing, by a preponderance of the evidence, that (1) there is a change of circumstances or new evidence, and (2) the proposed change is in the child's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The petition must be liberally construed in favor of its sufficiency. (Cal. Rules of Court, rule 5.570(a); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) "The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.*, at p. 310.) " '[I]f the petition presents any evidence that a hearing would promote the best interests of the child, the court will order the hearing.' [Citation.]" (*In re Jasmon O.*, at p. 415.) If, however, "the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the

---

[2]     Marsha's section 388 petition sought return of the minors to her custody, or alternatively, further reunification services. On appeal, Marsha has abandoned her request for an order returning the minors to her custody.

8

proposed change would promote the best interests of the child, the court need not order a hearing on the petition. [Citations.] The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189.)

B

Here, Marsha's modification petition alleged her circumstances had changed because she enrolled in residential drug treatment; she had been clean and sober for 115 days and progressed to phase II of the program; she participated in various treatment groups; she completed a parenting program; and she consistently visited the minors. The petition further alleged that providing Marsha with additional reunification services was in the minors' best interests because the minors were bonded to her and recognized her as their mother; visits were positive; Marsha was able to practice the skills she learned from parenting classes; the minors would benefit from more time with a mother who was sober and able to provide them with a safe and loving home; and the goal of family preservation would ultimately be achieved.

Although Marsha was in the process of addressing her substance abuse and had reestablished contact with the minors, "[n]ot every change in circumstance can justify modification of a prior order." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) Instead, "the problem that initially brought the child within the dependency system must be removed or ameliorated." (*Ibid.*; see also *In re B.D.* (2008) 159 Cal.App.4th 1218, 1230.) Here, the basis for the juvenile court's intervention and the primary reason for the minors' removal was

9

Marsha's mental illness, which resulted in her inability to provide proper care for the minors. Marsha had been depressed and overwhelmed, causing her to threaten suicide. While under psychiatric care, Marsha again tried to commit suicide. Throughout the reunification period, she continued to struggle with mental health issues, including having suicidal thoughts, which prevented her from effectively participating in services that would allow her to reunify with the minors. Contrary to Marsha's assertion, she was not yet "mentally sound" at the time she filed her section 388 petition. In December 2012, Marsha's mental stability was again called into question when she falsely claimed the caregiver told her the minors had been seriously injured in a car accident.[3] Thus, Marsha did not make a prima facie showing she had changed the circumstance—her serious mental illness—that prevented her from reunifying with the minors and resulted in the termination of her reunification services. (See *In re A.A.*, at p. 612 [incarcerated mother did not show changed circumstances where, despite completing various services and programs, she was still serving a prison sentence]; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 [in evaluating changed circumstances, one criterion court should consider is seriousness of problem that led to dependency and reason for continuation of that problem].)

With respect to allegations concerning Marsha's sobriety, parenting and visitation, the petition and supporting documentation show, at most, her circumstances were "changing," but had not changed. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) Marsha was three months into a six- to nine-month substance abuse program, which then required three months of aftercare. Although Marsha had been drug free for 115 days, the petition did not allege, and

---

3       This episode occurred while Marsha was under the care of a psychiatrist and receiving treatment at a mental health facility.

the record did not show, she had taken steps to sustain her treatment gains such as having a sufficient support system or obtaining a sponsor. Viewed in context, Marsha had just begun the difficult task of maintaining her sobriety. (See *In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."].) A petition like Marsha's that alleges changing circumstances does not promote stability for a child or the child's best interests because it would mean delaying the selection of a permanent home to see if a parent, who has failed to reunify with the child, might be able to reunify at some future point. "Childhood does not wait for the parent to become adequate." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) Thus, the changes alleged in Marsha's petition were "not legally sufficient to require a hearing on her section 388 petition." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 465.)[4]

In any event, Marsha's petition did not make a prima facie showing that offering her additional services, and thereby delaying permanency for the minors, would serve the minors' best interests. Although the minors love Marsha, know she is their mother and enjoy visits with her, "[t]he presumption favoring natural parents by itself does not satisfy the best interests prong of section 388." (*In re Justice P., supra,* 123 Cal.App.4th at p. 192.) Marsha's absence from the minors' lives for seven months caused their relationship with her to deteriorate. The minors are thriving in the home of a caregiver who is committed to adopting them.

Where, as here, reunification services have been terminated, a parent's "interest in the care, custody and companionship of the child [is] no longer paramount. Rather, at this point,

---

4    Nothing in the record indicates the court misunderstood the difference between the "pleading burden" and the "burden of proof," or that the court misunderstood the law regarding changed circumstances.

11

'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; see also *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [summary denial of section 388 petition was proper where there was no showing of how the children's best interests would be served by depriving them of a permanent stable home in exchange for an uncertain future].)  The proper focus of this case was the minors' need for stability, continuity and permanency, regardless of Marsha's interest in reunification.  (*In re Stephanie M.*, at pp. 317-318; *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1507.)  Because the liberally construed allegations of the petition would not have sustained a favorable decision on the section 388 petition, Marsha was not entitled to an evidentiary hearing.  (*In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 808; *In re Mary G.* (2007) 151 Cal.App.4th 184, 205-206.)

## II

Marsha challenges the sufficiency of the evidence to support the court's finding the beneficial parent-child relationship exception to adoption did not apply to preclude terminating her parental rights.  She asserts she shared a bond with Kelly and Z.F., who considered her to be their mother, enjoyed spending time with her and would be harmed by the severance of their relationship with her.  Marsha further asserts because Kelly and Z.F. were part of a bonded sibling group that needed to remain together under the same permanent plan, her parental rights should have been preserved as to all four minors.

## A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's

interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M*. (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid*.)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 573.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under one of the specified statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P*. (2002) 104 Cal.App.4th 395, 401.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural

13

parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent. (*Ibid.*; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)

We review an order terminating parental rights for substantial evidence. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. We do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The parent has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B

During the first few months of the dependency proceedings, Marsha had regular unsupervised visits with the minors. However, by December 2011, visits became sporadic and, by February 2012, Marsha stopped visiting altogether. She had no further contact with the minors for seven months and resumed visits a little more than two months before the selection

14

and implementation hearing. This was not the type of regular visitation and contact contemplated by the Legislature when it provided for an exception to the adoption preference. (§ 366.26, subd. (c)(1)(B)(i).)

Even if the visitation and contact Marsha had with the minors can be characterized as "regular," she did not meet her burden of showing there was a beneficial parent-child relationship sufficient to apply the exception of section 366.26, subdivision (c)(1)(B)(i).

During Marsha's absence from the minors' lives, caused in part by her substance abuse, the minors had to rely on others to meet their daily needs. Consequently, their relationship with Marsha deteriorated and was no longer parental. T.F. and Corey were confused about their permanent plans because Marsha told them they would be returning home to her. Nevertheless, T.F. and Corey were clear about wanting the caregiver to adopt them. Marsha showed love and concern for the minors, but sometimes had difficulty supervising Kelly and Z.F. during visits, relying instead on T.F. and Corey to ensure their safety. Although Kelly and Z.F. were affectionate toward Marsha and enjoyed weekly visits with her, they were not adversely affected when visits ended. "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) The love and affection Marsha shared with the minors during visits was not enough to show the minors had a " 'significant, positive, emotional attachment' " to her such that terminating the parent-child relationship would result in great harm to these children. (*In re Jason J.*, *supra*, 175 Cal.App.4th at pp. 936-938; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

15

Further, Marsha did not show that maintaining the parent-child relationship outweighed the benefits of adoption for the minors.  In the social worker's opinion, the minors' need for stability, safety and permanency outweighed any possible detriment that would be caused by severing the parental relationship.  The court was required to, and did, weigh the strength and quality of the parent-child relationship, and the detriment involved in terminating it, against the potential benefit of an adoptive home for the minors.  We do not reweigh the evidence or substitute our judgment for that of the juvenile court.  (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

Although Marsha believes that a permanent plan other than adoption would serve the minors' best interests, adoption is the only option that would provide this bonded sibling set with the stability and permanence that they so desperately need.  (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419 [Legislature has decreed guardianship is not in best interests of children who cannot be returned to their parents; only adoption affords the most permanent and secure alternative]; *In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368-1369 [parents' preference to preserve family unit does not override best interests of minors in stability and security of adoptive home].)  Substantial evidence supports the court's finding the beneficial parent-child relationship exception did not apply to preclude terminating parental rights.

## DISPOSITION

The orders are affirmed.

IRION, J.

WE CONCUR:

MCINTYRE, Acting P. J.

AARON, J.

17